Entered on Docket
September 24, 2015
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



Signed and Filed: September 24, 2015

**HANNAH L. BLUMENSTIEL**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re: | ) | Case No. 12-30953 HLB |
| | ) | |
| BENJAMIN PUI-YUN CHUI, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| TRADEX GLOBAL MASTER FUND SPC, LTD., et al., | ) | Adv. Proc. No. 12-3102 HLB |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BENJAMIN PUI-YUN CHUI, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM DECISION

**I.   INTRODUCTION**

This adversary proceeding came before the Court for trial on the complaint of Plaintiffs Tradex Global Master Fund SPC, Ltd. and Tradex Global Advisors LLC (collectively, "Plaintiffs") against Defendant Benjamin Pui-Yun Chui ("Defendant").  Plaintiffs' complaint asserted claims for nondischargeability under sections 523(a)(4) and (a)(19) of the Bankruptcy Code.[1]  On December 19, 2014, Plaintiffs filed a

---

[1] Unless otherwise noted, all statutory citations shall refer to Title 11 of the United States Code (the "Bankruptcy Code"), 11 U.S.C. § 101 et seq., and

motion seeking summary judgment under section 523(a)(19), predicated upon an SEC administrative cease and desist order. On January 29, 2015, the Court denied Plaintiffs' motion, finding that the SEC order could not be used preclusively to establish nondischargeability.

On March 3 and 4, 2015, the Court held a two-day trial on the merits of the complaint. Shortly thereafter, the Court required the parties to file post-trial briefs addressing four discrete issues:

1. Whether Defendant committed a "violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws" as required by section 523(a)(19)(A);

2. Whether section 523(a)(19)(B) can be satisfied by an order of this Court, assuming the Court finds that Plaintiff is owed a debt that is for a violation of a securities law or fraud as required by section 523(a)(19)(A);

3. Whether there existed an express or technical trust of the kind that creates a fiduciary obligation that might give rise to liability under section 523(a)(4); and

4. Whether the fiduciary obligations of an investment manager such as American Pegasus Investment Management, Inc. or American Pegasus LDG, LLC can be imputed to Defendant, assuming such obligations arise from an express or technical trust, as contemplated by section 523(a)(4).

The parties timely submitted post-trial briefs.

This memorandum decision constitutes the findings of fact and conclusions of law required by Rule 52(a) of the Federal

_____

all citations to rules of procedure shall refer to the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule").

Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. As explained below, the Court finds that Plaintiffs have failed to prove all essential elements of their claims, and that judgment should be entered in favor of the Defendant.

**II. BACKGROUND**

Defendant was a registered investment advisor with the Securities and Exchange Commission, and a director of American Pegasus SPC ("APSPC"), a Cayman Islands limited liability investment company incorporated as a segregated portfolio company. From 1997 to 2007, Defendant was the sole owner of American Pegasus Investment Management, Inc. ("APIM"). APIM acted as the investment manager for APSPC through August 1, 2008. Thereafter, APIM was replaced as investment manager by American Pegasus LDG, LLC ("APLDG"), APIM's successor by merger.

APSPC sold shares to investors in several separate portfolios through third party investment advisors, including APIM and APLDG. One of these portfolios, the American Pegasus Auto Loan Fund (the "Fund"), was created in 2005 for the purpose of investing in sub-prime automobile loans.

Synergy Acceptance Corp. ("SAC") is a finance company utilized by the Fund. One of SAC's primary roles was to originate loans directly with consumers, which it would then sell to the Fund. SAC also was a servicer, responsible for collecting monthly payments, repossessing vehicles, and liquidating vehicles. In addition to originating and servicing loans, SAC also acted as a loan aggregator, purchasing loans from other

financing companies in the Georgia and Tennessee area and then selling those loans to the Fund.

Through a series of transactions beginning June 2007, Defendant and several others purchased SAC through a holding company, Synergy Equity LLC ("SE"). SE borrowed approximately $13.575 million from the Fund to complete the purchase. In addition to lending money to SE, the Fund loaned approximately $12.12 million to several of APSPC's life insurance funds from April 2007 to May 2009.

Plaintiff Tradex Global Advisors LLC describes itself as a "research oriented hedge fund." Tradex Global Advisors LLC is the investment manager for the other plaintiff in this case, Tradex Global Master Fund SPC, Ltd. Between March 2007 and August 2008, Plaintiffs made the following investments in the Fund:

| March 1, 2007 | $300,000.00 |
|---------------|-------------|
| April 1, 2007 | $325,000.00 |
| May 1, 2007 | $800,000.00 |
| August 1, 2008 | $367,500.00 |

Plaintiffs' decision to invest in the Fund was informed, at least in part, by several sources: an offering memorandum dated October 2006 (the "Offering Memorandum"), a power point presentation dated October 2006, a document labeled "FAQ for American Pegasus Auto Loan Fund" dated September 2006, an undated marketing document, a due diligence document dated August 2007 (the "Due Diligence Document"), and a power point presentation dated September 2007 (collectively, the "Marketing Materials").

Case: 12-03102  Doc# 76  Filed: 09/24/15  Entered: 09/24/15 18:03:36  Page 4 of 33

Each document in the Marketing Materials made reference to the Fund utilizing "auto finance companies" plural. For example, the Offering Memorandum, which indicates that it was prepared by APIM, stated:

> The Portfolio will purchase the Loans from auto finance companies and from independent and franchised auto dealers originating contracts for the purchase of used automobiles and light trucks from persons with impaired credit.

The Due Diligence Document for the Fund is a template form with various questions or instructions accompanied by spaces for corresponding answers. Under the heading "Investment Research" is the instruction "Describe the typical flow of an investment idea from inception to a trading position." Next to this appears the statement:

> Finance companies who work under our specific underwriting restrictions may originate the loans. These underwriting guidelines are set by the fund manager team. The borrower is required to submit documentation to support their loan application. The first screening of a loan is conducted by the auto loan finance companies, who act as the fund's agents. They are also appointed by the manager to collect the monthly payments from borrowers on the fund's behalf.

In March 2008, Plaintiffs requested a redemption of some of their investment in the Fund. This redemption request was made in the ordinary course of Plaintiffs' business operations. The Fund honored that request in May 2008, returning $250,000 of Plaintiffs' invested capital.

In October 2008, Plaintiffs made two requests seeking a full redemption of their remaining investment to be paid December 1, 2008. Plaintiffs made these requests because they began to see flat performance in the Fund, which caused them to begin asking questions regarding the health of the Fund. In November 2008,

the Fund suspended redemptions.  Accordingly, the October 2008
redemption requests were not honored, and Plaintiffs have not
received the remainder of their investment.

None of the Marketing Materials disclosed the Fund's loan to
SE or to the other funds operated by APSPC, and none disclosed
Defendant's ownership interest in SAC through SE.  Plaintiffs did
not discover the Fund's loan to the other funds operated by APSPC
until the release of a combined 2007-2008 audit report (the
"Audit Report").

**III. DISCUSSION**

Plaintiffs' complaint alleges nondischargeability under
sections 523(a)(4) and (a)(19) of the Bankruptcy Code.  Section
523(a)(4) excepts from discharge any debt "for fraud or
defalcation while acting in a fiduciary capacity, embezzlement,
or larceny."  Section 523(a)(19) generally excepts from discharge
debts arising from a judgment or order for violation of state of
federal securities laws, or for fraud in connection with
securities.

**A.    Section 523(a)(4)**

The complaint alleges nondischargeability only for fraud or
defalcation while acting in a fiduciary capacity; it does not
allege nondischargeability for embezzlement or larceny.  To
succeed, Plaintiffs bear the burden of proving by a preponderance
of the evidence: (1) fraud or defalcation, and (2) that debtor
was acting in a fiduciary capacity.  11 U.S.C. § 523(a)(4).  The
Court finds and concludes that Plaintiffs have failed to meet
their burden of establishing either of these elements.

### 1. Fraud

Fraud within the meaning of section 523(a)(4) means actual fraud. Roussos v. Michaelides (In re Roussos), 251 B.R. 86 (B.A.P. 9th Cir. 2000). The elements of actual fraud include:

1. the debtor made a representation;
2. the debtor knew at the time the representation was false;
3. the debtor made the representation with the intention and purpose of deceiving the creditor;
4. the creditor relied on the representation; and
5. the creditor sustained damage as the proximate result of the representation.

Citibank (S.D.), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1086 (9th Cir. 1996) (discussing 523(a)(2)(A)); In re Dakota Steel, Inc., 284 B.R. 711 (Bankr. N.D. Cal. 2002) (apart from fiduciary capacity requirement, the elements of fraud under section 523(a)(4) do not differ from those under section 523(a)(2)(A)).

### a. Misstatements or omissions

In this case, Plaintiffs allege three general categories of misstatements or omissions that could give rise to liability for actual fraud under section 523(a)(4):

i. Statements indicating that the Fund used more than one servicer or financing company;

ii. Statements indicating that the Fund invested only in the purchase of subprime auto loans, and the failure to disclose the Fund's investments in SE or the other funds; and

iii. The failure to disclose Defendant's ownership interest in SAC as a potential conflict of interest.

As to each of these categories, Plaintiffs have failed to identify an actionable misstatement or omission.

### i. "Companies"

With regards to the Fund's use of more than one finance company, Plaintiffs primarily point to portions of the Marketing Materials that use the plural term "auto finance companies." Plaintiffs assert that, because these documents used the plural "companies," they were led to believe that the Fund obtained loans from two or more finance companies, and that the Fund's use of SAC as its sole finance company renders such statements false and misleading. This argument fails for several reasons.

First, of all the Marketing Materials presented by Plaintiffs, only the Due Diligence Document purports to be created by the Defendant. To establish actual fraud in the nondischargeability context, Plaintiffs must establish that "the debtor made the representations." Eashai, 87 F.3d at 1086. Each of the other Marketing Materials purports to have been created by APSPC, APIM, or a member of APIM other than the Defendant. Plaintiffs cite no case law in their briefs, and this Court has found none, for the proposition that misrepresentations made by APSPC or APIM may be imputed to Defendant.[2] Plaintiffs have failed to establish that the Defendant is directly responsible for any of the statements contained in the Marketing Materials other than those contained within the Due Diligence Document.

Second, a reasonable reading of the term "auto finance companies" does not mandate the conclusion that the use of the

---

[2] This is different from the imputation of fiduciary obligations the Court ordered briefed, which is discussed in more detail in section III.a.3, infra.

plural word "companies" necessarily means "two or more, but definitely not just one." A reasonable reader could interpret that sentence as meaning "one or more" companies because use of a plural word does not necessarily exclude the singular. See Greg N. Carlson, <u>A Unified Analysis of the English Bare Plural</u>, Linguistics and Philosophy 1, 413-58 (1977) (discussing the "diversity of possible interpretations" of plurals in the English language).

Third, Defendant testified that the Fund did in fact use more than one finance company. Defendant testified that loan origination was only one of SAC's functions, and that in its role as a loan aggregator, SAC also acquired loans from other finance companies. Defendant testified that the Fund used five other finance companies. He testified that SAC was but one of the companies used, that multiple finance companies were necessary because SAC only operated in Georgia, and that the other finance companies operated in other states. Simply because the Fund aggregated loans through a company that happened to act as finance company does not mean that the Fund used only one finance company. The Court finds this testimony to be credible and sufficient to render the statements in the Marketing Materials true, and therefore not false or misleading.

The only other evidence offered by Plaintiffs on the issue of their being led to believe that the Fund used more than one finance company was the testimony of Mr. Beattie, one of the Plaintiffs' principals. Mr. Beattie testified that several representatives of APIM, but not Defendant, specifically told him at a meeting that the Fund used more than one finance company, or

more than one "servicer."[3]  Mr. Beattie then testified that
Defendant later confirmed these statements via telephone.
Plaintiffs offer no other evidence to corroborate that these
statements were made, and ultimately, the Court does not find Mr.
Beattie's testimony to be credible.

**ii.  The Fund's investment in only subprime automobile loans**

The section of the Offering Memorandum titled "Investment
Objective" begins by stating "[t]he Portfolio's investment
objective is to earn a steady return by purchasing sub-prime auto
loans issued in the United States and by selling such loans on
the secondary market."  Similar language is contained in monthly
performance sheets issued by APIM.  Plaintiffs assert that
Defendant did not disclose to them the Fund's investments in the
other funds and SE, and that such nondisclosure constitutes a
fraudulent omission.  In the bankruptcy context, an omission
designed to perpetrate a fraud can satisfy the misrepresentation
element of actual fraud.  <u>Eashai</u>, 87 F.3d at 1089.  The Court
does not find, however, that Defendant's failure to disclose the
Fund's investment in the other funds, or its loans to SE,
constitutes actionable misrepresentation.  No place in the
Offering Memorandum or other Marketing Materials does there
appear the assertion or guaranty that the Auto Loan Fund would
invest exclusively in sub-prime auto loans such that APIM or
Defendant's failure to disclose such information would render
these documents misleading.  In fact, the documents expressly

---

[3] At trial, Mr. Beattie drew a distinction between a finance company - a
company that originates loans, and a servicer - a company responsible for
servicing individual loans and repossessing vehicles.

provide to the contrary.  The Offering Memorandum specifically states:

> The Investment Manager does not expect the Portfolio to invest in any assets other than the sub-prime Loans discussed above, U.S. Treasuries, and interest-rate derivatives for hedging purposes.  **Depending on conditions and trends in the financial markets, the Investment Manager may pursue other strategies or employ other techniques it considers appropriate and in the Portfolio's best interests.**

(emphasis added).  This clearly discloses the possibility that APIM may cause the Fund to invest in something other than sub-prime auto loans.  Further, Schedule F to the Form ADV attached to the Offering Memorandum, upon which Plaintiffs rely in their trial briefing, states:

> Based on analysis of targeted companies American Pegasus may cause clients to invest in any securities it deems appropriate, including restricted securities.  American Pegasus may also invest in Senior Life Settlement insurance policies, reinsurance policies and investment pools that invest in Senior Life Settlement insurance policies.

The Court finds that these statements are sufficient to render APIM and Defendant's failure to disclose the Fund's investments in assets other than sub-prime auto loans not misleading. Accordingly, Plaintiffs have not met their burden of establishing a misrepresentation or omission.

**iii. Failure to disclose a conflict of interest**

Plaintiffs lastly assert that Defendant's failure to disclose his purchase of SAC via SE constituted a material misrepresentation.  In support of this, Plaintiffs point to page 20 of the Offering Memorandum, which contains the heading "Potential Conflicts of Interest."  While this portion of the

Offering Memorandum does discuss conflicts of interest, it does not disclose particular conflicts, or make the representation that the conflicts disclosed by such section are the only conflicts of interest that may arise.  In fact, the Offering Memorandum specifically puts interested parties on notice that the potential for conflicts of interest exists without expressly delineating those conflicts.  The section entitled "Other Business Relationship" states:

> The Investment Manager will devote as much of its time and resources to the activities of the Fund as it deems necessary and appropriate.  The Investment Management Agreement does not restrict the Investment Manager or its principals or affiliates from entering into other fund management relationships, or other investment advisory relationships or engaging in other business activities, even though those activities may be in competition with the Fund and/or may involve substantial amounts of the Investment Manager's time and resources.

This language discloses the possibility that APIM and Defendant may enter into business relationships that could present a conflict of interest.  Further, Plaintiffs acknowledge in their briefs that the Form ADV attached to the Operating Memorandum discloses the possibility that the Fund may invest in positions held by persons like Defendant:

> From time to time, American Pegasus may cause clients to buy a security in which American Pegasus or an associated person has an ownership position. . . .

If anything, the Operating Memorandum and Form ADV fully disclose the potential for conflicts of interest, and specifically the type of conflict of which Plaintiffs complain.  Plaintiffs' trial briefs stress the fact that they believed Defendant's purchase of

SAC to have created a conflict of interest.  Even if it did
create a conflict of interest, Defendant's failure to immediately
disclose that conflict does not render the Offering Memorandum
misleading.  Again, Plaintiffs have failed to meet their burden
of demonstrating a misrepresentation or omission.

    **b.   Intent**

    Plaintiffs have also failed to establish that Defendant
acted with the requisite intent required for actual fraud.
Plaintiffs have offered no direct evidence of Defendant's actual
intent.  The Court may, however, infer intent from the totality
of the circumstances.  Gertsch v. Johnson & Johnson, Fin. Corp.
(In re Gertsch), 237 B.R. 160, 167-68 (B.A.P. 9th Cir. 1999).
Here, the Court finds that Plaintiffs have not offered
circumstantial evidence from which the Court might infer intent.
Nothing in the record indicates that any of the Marketing
Materials (whether prepared by Defendant or otherwise) were
designed to intentionally mislead Plaintiffs into investing in
the Fund, and the Court found Defendant's testimony and
explanations credible.  Accordingly, Plaintiffs have failed to
meet their burden on this issue.

    **2.   Defalcation**

    Defalcation is the misappropriation of trust funds or money
held in a fiduciary capacity, or the failure to properly account
for such funds.  Utnehmer v. Crull (In re Utnehmer), 499 B.R.
705, 712 (B.A.P. 9th Cir. 2013)(citing Lewis v. Scott (In re
Lewis), 97 F.3d 1182, 1185 (9th Cir. 1996)).  Defalcation
requires more than just negligence.  The Supreme Court has found
that defalcation under section 523(a)(4) includes a culpable

state of mind requirement involving knowledge of, or gross recklessness in respect to, the improper nature of the fiduciary's behavior. <u>Bullock v. BankChampaign, N.A.</u>, 133 S. Ct. 1754, 1756 (2013). Where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, "defalcation" requires an intentional wrong. <u>Id.</u> An intentional wrong includes not only conduct that the fiduciary knows is improper, but also reckless conduct of the kind that the criminal law often treats as the equivalent. <u>Id.</u> Where actual knowledge of wrongdoing is lacking, conduct is considered equivalent if, as set forth in the Model Penal Code, the fiduciary "consciously disregards" or is willfully blind to "a substantial and unjustifiable risk" that his conduct will violate a fiduciary duty. <u>Id.</u>

Plaintiffs have failed to establish defalcation. Per the Audit Report, it is the Fund who made the intra-fund loans. There is no evidence APIM misappropriated any of the money it may have been handling for the Fund for it or Defendant's personal gain, nor has APIM failed to account for any funds they may have had access to by virtue of its status as the Fund's investment manager. Defendant, as an agent of APIM, invested funds pursuant to the authority granted to him. Plaintiffs have not demonstrated that any money held in trust was misappropriated or that Defendant otherwise failed to account for such funds.[4] And as above, Plaintiffs have failed to establish any intent on the part of Defendant to misappropriate funds held in trust.

---

[4] Plaintiffs have also failed to establish the existence of a trust res such that relief can be had under section 523(a)(4), discussed infra.

### 3. Fiduciary Capacity

To prevail on a nondischargeability claim under section 523(a)(4), a plaintiff must prove not only a defendant's fraud or defalcation, but also that the defendant was acting in a fiduciary capacity when it committed the fraud or defalcation. Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 378 (B.A.P. 9th Cir. 2011)(citing In re Teichman, 774 F.2d 1395, 1398 (9th Cir. 1985)). The broad definition of fiduciary under nonbankruptcy law – a relationship involving trust, confidence, and good faith – is inapplicable in the dischargeability context, in which the Ninth Circuit has adopted a much narrower definition of "fiduciary." Honkanen, 446 B.R. at 378 (citing Cal-Micro, Inc. v. Cantrell (In re Cantrell), 329 F.3d 1119, 1125 (9th Cir. 2003); Lewis v. Short (In re Short), 818 F.2d 693, 695 (9th Cir. 1987); Ragsdale v. Haller, 780 F.2d 794, 796 (9th Cir. 1986); Woosley v. Edwards (In re Woosley), 117 B.R. 524, 529 (B.A.P. 9th Cir. 1990)).

To give rise to a claim under section 523(a)(4), the fiduciary relationship must be one arising from an express or technical trust. Honkanen, 446 B.R. at 378–79. "Fiduciary" in this context is therefore a narrowly construed question of federal law, although state law can be consulted "to ascertain whether the requisite trust relationship exists." Cantrell, 329 F.3d at 1125 (citing Lewis, 97 F.3d at 1185 and Ragsdale, 780 F.2d at 796).

For many of the past 25 years, courts within the Ninth Circuit have applied a combined statutory and case-law analysis to determine fiduciary capacity. Historically, courts determined

Case: 12-03102   Doc# 76   Filed: 09/24/15   Entered: 09/24/15 18:03:36   Page 15 of 33

this by focusing on duties under state law, rather than the existence of an express trust.  Accordingly, courts both in and outside of the Ninth Circuit found licensed real estate brokers, securities brokers, and other professionals to be fiduciaries for purposes of section 523(a)(4).  See, e.g., Woosley v. Edwards (In re Woosley), 117 B.R. 524 (B.A.P. 9th Cir. 1990) (California real estate broker is a fiduciary); Lock v. Scheuer (In re Scheuer), 125 B.R. 584 (Bankr. C.D. Cal. 1991) (securities broker found to be fiduciary subject to section 523(a)(4)); In re Peterson, 96 B.R. 314 (Bankr. D. Colo. 1988) (registered investment adviser is a fiduciary under section 523(a)(4)); Prudential–Bache Securities, Inc. v. Sawyer (In re Sawyer), 112 B.R. 386 (D. Colo. 1990) (commodities broker is a fiduciary under section 523(a)(4)).

Case law has evolved, however, and the current rule recognizes that state law fiduciary duties alone are insufficient to establish the fiduciary capacity required under section 523(a)(4).  See Honkanen, 446 B.R. at 379.  For a trust relationship under section 523(a)(4) to be established, the applicable state law must clearly define fiduciary duties and identify trust property.  Id. (citing Runnion v. Pedrazzini (In re Pedrazzini), 644 F.2d 756, 759 (9th Cir. 1981)) (emphasis added).  Accordingly, the fact a defendant may be an investment advisor with fiduciary duties to its client is insufficient to establish liability under section 523(a)(4) unless a plaintiff can also identify the existence of an express or technical trust.

Under California law, an express trust requires five elements: 1) present intent to create a trust, 2) a trustee, 3)

trust property, 4) a proper legal purpose, and 5) a beneficiary. Cal. Prob. Code §§ 15201-15205; Keitel v. Heubel, 126 Cal. Rptr. 2d 763, 773 (Ct. App. 2002). Technical trusts under California law are described as "those arising from the relation of attorney, executor, or guardian, and not to debts due by a bankrupt in the character of an agent, factor, commission merchant, and the like." Royal Indemnity Co. v. Sherman, 269 P.2d 123, 125 (Cal. Ct. App. 1954); Young v. Clark, 93 P. 1056, 1057 (Cal. Ct. App. 1907). A technical trust is not one implied by contract. Young, 93 P. at 1057.

Here, the only trust property, or "res," that could give rise to section 523(a)(4) liability would be the assets of the Fund. APIM, not Defendant, was the investment manager for the fund. While APIM might have acted in a fiduciary capacity of the type required by section 523(a)(4), Plaintiffs have failed to establish that Defendant acted in such a capacity.

The Court asked the parties to brief whether Defendant might be held vicariously liable for the actions of APIM should APIM be found to have acted in a fiduciary capacity. The parties' briefs offered little to address vicarious liability, or whether there existed a trust res such that section 523(a)(4) liability might attach. As noted above, however, there is no evidence that APIM committed fraud, and no evidence that APIM misappropriated or failed to account for the Fund's assets. Since Plaintiffs have failed to establish that Defendant or APIM committed any fraud or defalcation, the Court need not reach the issue of whether APIM's fiduciary obligations might be imputed to Defendant.

Because Plaintiffs have failed to meet their burden to establish by a preponderance of the evidence the elements of section 523(a)(4), the Court finds in favor of Defendant on this cause of action.

**B.    Section 523(a)(19)**

Section 523(a)(19) states that a discharge under section 727 does not discharge an individual debtor from any debt that:

(A) is for—
> (i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or
> (ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

(B) results, before, on, or after the date on which the petition was filed, from—
> (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;
> (ii) any settlement agreement entered into by the debtor; or
> (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

11. U.S.C. § 523(a)(19).  In short, to succeed on an action for nondischargeability under section 523(a)(19), Plaintiffs must show that two requirements are met.  First, Plaintiffs must show that the debt is for a securities law violation or fraud in connection with the sale of a security.  11 U.S.C. § 523(a)(19)(A).  And second, Plaintiffs must show that the debt

results from some form of judicial or administrative determination, or from a settlement agreement.  11 U.S.C. § 523(a)(19)(B).

**1.    Satisfaction of section 523(a)(19)(B)**

A nonbankruptcy tribunal has not previously entered judgment against Defendant and in favor of Plaintiffs on any claims based upon violations of securities laws or fraud.[5]  Accordingly, after trial the Court asked the parties to brief the issue of whether or not this Court may enter a judgment that would thus satisfy the requirements of section 523(a)(19)(B), and under what legal theories it might do so.

On the issue of a bankruptcy court entering such a judgment, there is a clear split of authority.  In Faris v. Jafari (In re Jafari), the court examined the legislative history of section 523(a)(19), which emphasized that the primary purpose of the statute was to ensure that judgments and settlements from state securities fraud cases are nondischargeable without the need to re-litigate in bankruptcy court.  401 B.R. 494, 496 (Bankr. D. Col. 2009) (citing 148 Cong. Rec. S7418, 7419 (July 26, 2002)). The Jafari court reasoned that subsection B was included for the purpose of giving preclusive effect to such claims whether memorialized pre- or post-bankruptcy, but not to give the bankruptcy court authority to decide liability on those claims. Id.  If Congress had desired to give the bankruptcy court such authority, it could have rewritten the statute, eliminating subsection B, and adding to subsection A that prior court or

---

[5] As the Court noted in denying Plaintiffs' motion for summary judgment, the SEC order was not a ruling in favor of Plaintiffs.

administrative determinations and settlements "were to be given preclusive effect, without regard to traditional preclusion doctrines." Id. at 499. Ultimately, the court concluded that subsection B "evidences a conscious choice to have the liability determination occur outside of the bankruptcy forum, whether it occurs pre- or post-bankruptcy." Id. at 499-500.

Several courts have either adopted the reasoning of Jafari or have come to similar conclusions. See, e.g., McGraw v. Collier (In re Collier), 497 B.R. 877, 894 (Bankr. E.D. Ark. 2013) (adopting Jafari); Terek v. Bundy (In re Bundy), 468 B.R. 916, 921 (Bankr. E.D. Wash. 2012) (ruling that allowing a bankruptcy court to decide liability for securities violations renders section 523(a)(19)(B) superfluous; Voss v. Pujdak (In re Pujdak), 462 B.R. 560, 574 (Bankr. D.S.C. 2011) (stating nonbankruptcy tribunals must decide securities law violations); Cutcliff v. Reuter (In re Reuter), 427 B.R. 727, 760 (Bankr. W.D. Mo. 2010), aff'd, 443 B.R. 427 (B.A.P. 8th Cir. 2011), aff'd, 686 F.3d 511 (8th Cir. 2012) (stating in dicta that if the issue were before it, the court would likely agree with Jafari that a non-bankruptcy forum is required to determine liability under section 523(a)(19)(B)).

Many bankruptcy courts, however, including several in the Ninth Circuit, have come to the opposite conclusion. In Floyd v. Hill (In re Hill), the court concluded that reading section 523(a)(19) to prohibit bankruptcy courts from entering judgments in satisfaction of subsection B would be disruptive. 495 B.R. 646 (Bankr. D.N.J. 2013). The court questioned how exceptions to discharge for common law fraud (523(a)(2)), fraud or defalcation

Case: 12-03102   Doc# 76   Filed: 09/24/15   Entered: 09/24/15 18:03:36   Page 20 of 33

(523(a)(4)), and willful and malicious injury (523(a)(6)) — so often coupled with those of section 523(a)(19) but subject to exclusive bankruptcy jurisdiction — would be adjudicated. <u>Id.</u> The court concluded that Congress could not have intended to create the procedural mishmash which such limited bankruptcy court jurisdiction would engender. <u>Id.</u>

In <u>Gelber v. Jensen-Ames</u> (<u>In re Jensen-Ames</u>), the bankruptcy court examined the legislative history of section 523(a)(19), but came to a different conclusion than <u>Jafari</u>. <u>Gelber v. Jensen-Ames</u> (<u>In re Jensen-Ames</u>), 2011 Bankr. LEXIS 1207, at *21 (Bankr. W.D. Wash. Mar. 29, 2011). The court noted that, in the Ninth Circuit, a bankruptcy court's authority to enter a judgment establishing the monetary amount of a claim in connection with making a nondischargeability determination is not in question. <u>Id.</u> (citing <u>Sasson v. Sokoloff</u> (<u>In re Sasson</u>), 424 F.3d 864 (9th Cir. 2005), cert. denied, 547 U.S. 1206 (2006)).

In <u>Williams v. Sato</u> (<u>In re Sato</u>), the court discussed <u>Hill</u> and several other decisions on both sides of the issue. 512 B.R. 241, 252 (Bankr. C.D. Cal. 2014). <u>Sato</u> concluded that the language of subsection B, as well as legislative history and policy considerations, support the more expanded view, which is closer in line with the broad language of the Code, the effort to make it even broader by the BAPCPA amendments, and the need to litigate all exceptions to discharge in one proceeding and avoid piecemeal litigation. <u>Id.</u> The rationales of both <u>Hill</u> and <u>Sato</u> were recently adopted by a California district court. <u>One Longhorn Land I, L.P. v. Presley</u>, 529 B.R. 755, 761 (C.D. Cal. 2015).

1    While the arguments on both sides of this issue are
2    compelling, this Court is inclined to follow the rationale of
3    Hill and Sato.  Given that current Ninth Circuit authority
4    authorizes this court to liquidate claims in conjunction with
5    determining their nondischargeability, and the fact that the
6    plain language of the statute contemplates entry of judgment
7    after the filing of the petition, the more reasonable
8    interpretation of section 523(a)(19)(B) is that this Court may
9    enter a judgment in satisfaction of that section.

10       **2.   Securities laws violations**

11       Having found that this Court may enter a judgment for
12   violation of a securities law against Defendant in satisfaction
13   of section 523(a)(19)(B), the Court must determine whether
14   Defendant committed such a violation.  Plaintiffs' post-trial
15   brief asserts four theories under which this Court might be able
16   to enter such a judgment:

17   • Rule 10b-5;

18   • Section 17(a) of the Securities Act of 1933

19   • Rules 206 and 207 of the Investment Advisers Act of 1940;
20      and

21   • Cal. Corp. Code 25401, 25501, and 25504.

22   The Court hereby finds that Plaintiffs have failed to establish a
23   right to judgment under any of these theories.[6]

24

25

26   _____
     [6] The Court notes that none of these claims were pleaded as separate causes of
27   action in the complaint, apart from their inclusion in Plaintiffs' description
     of the order entered by the SEC.  Because the Court finds that Plaintiffs have
28   failed to establish a violation of any of these securities laws, the Court
     need not address the propriety of Plaintiffs' failure to plead.

### a. Section 17(a) of the Securities Act of 1933

Of the four theories Plaintiffs offer, two may be disposed of immediately. The Ninth Circuit has expressly found that section 17(a) of the Securities Act of 1933 does not provide a private cause of action. In re Washington Pub. Power Supply Sys. Sec. Litig., 823 F.2d 1349 (9th Cir. 1987). Thus, Plaintiffs cannot prevail under this theory of liability, and it cannot serve as the basis for the debt they claim should be excepted from discharge under section 523(a)(19).

### b. The Investment Advisers Act of 1940

The Supreme Court has found that there is no private right of action under the Investment Advisers Act of 1940, other than for avoidance of an investment adviser's contract, which is not at issue here. Transamerica Mortg. Advisors (tama) v. Lewis, 444 U.S. 11 (1979). Accordingly, Plaintiffs' claim for violation of these statutes must fail, as must Plaintiffs' contention that such claims serve as the basis for nondischargeability under section 523(a)(19).

### c. Rule 10b-5

Rule 10b-5, codified in 17 C.F.R 240.10b-5, prohibits fraudulent conduct in connection with the purchase or sale of a security. Although neither Rule 10b-5 nor the statute it interprets, section 10(b) of the Securities Exchange Act of 1934, expressly creates a private right of action, such an action has been developed by the courts. Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2298 (2011) (citing Superintendent of Ins. of N. Y. v. Bankers Life & Casualty Co., 404 U.S. 6, 13, n. 9 (1971)). The elements of a private action

under Rule 10b-5 are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).

### i. Material misrepresentation or omission

Plaintiffs have not met their burden of establishing a material misrepresentation or omission. A statement is material if a reasonable investor would have viewed the non-disclosed information "as having significantly altered the total mix of information made available." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27 (2011) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988)). A statement is misleading for purposes of Rule 10b-5 if "it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 985 (9th Cir. 2008) (internal citation and quotation marks omitted). Rule 10b-5 prohibits, however, only misleading and untrue statements, not statements that are incomplete. "Often, a statement will not mislead even if it is incomplete or does not include all relevant facts." Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002).

Liability under Rule 10b-5 is limited to the maker of a statement. Janus Capital, 131 S.Ct. at 2298. For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and

Case: 12-03102    Doc# 76    Filed: 09/24/15    Entered: 09/24/15 18:03:36    Page 24 of 33

whether and how to communicate it.  Id. at 2302.  Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.  Id.  One who prepares or publishes a statement on behalf of another is not its maker.  Id.

Under Janus Capital, Defendant is not the "maker" of any of the Marketing Materials, even the one upon which his name appears.  Because these statements were made on behalf of the corporate entity, the entity is the "maker" for purposes of an analysis under Rule 10b-5.  Accordingly, Defendant has no directly liability under Rule 10b-5 in relation to the Marketing Materials.  Defendant can still be held liable, however, for any other statements he made, and he can be held vicariously liable for the statements of APIM under section 20(a) of the Securities Exchange Act of 1934.  15 U.S.C. § 78t(a).

The standard for a misrepresentation or omission under Rule 10b-5 tracks that of actual fraud.  The Court concludes here, as it did in its section 523(a)(4) fraud analysis, that Plaintiffs have failed to establish an actionable misrepresentation or omission on the part of APIM or Defendant.  While the alleged statements and omissions may have been material, the Court does not find them to have been false or misleading.  Further, the Court finds now as it did above that Plaintiffs have failed to meet their burden of establishing that Defendant personally made any other statements that would be actionable.

**ii.  Scienter**

Plaintiffs have not met their burden of establishing the intent required under Rule 10b-5.  The requisite state of mind for a securities fraud case is "knowing or intentional conduct,"

or reckless conduct "to the extent that it reflects some degree of intentional or conscious misconduct, or what we have called deliberate recklessness." WPP Lux. Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1051 (9th Cir. 2011). Again, this element tracks the intent element of actual fraud or defalcation under section 523(a)(4). For the same reasons stated above, the Court finds that Plaintiffs have failed to meet their burden of proving fraudulent intent.

### iii. Causation

Plaintiffs also have not met their burden of establishing causation. The causation element for Rule 10b-5 actions includes "both transaction causation, that the violations in question caused the plaintiff to engage in the transaction, and loss causation, that the misrepresentation or omissions caused the harm." Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 949 (9th Cir. 2005). Transaction causation is commonly understood to mean reliance. See, e.g., Levinson, 485 at 248–49. Loss causation, on the other hand, requires proof of some nexus between the defendant's alleged misconduct and the economic harm suffered by the plaintiff. Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. 1981), aff'd in part, rev'd in part on other grounds, 459 U.S. 375 (1983). The loss causation requirement allows courts to separate losses attributable to a fraudulent statement from those attributable to other intervening market forces, such as a general downturn in the economy, unexpected increases in the cost of goods (e.g., the price of oil), and other economic events that may negatively impact a business. As one court noted: "Absent the requirement of

1  causation, Rule 10b-5 would become an insurance plan for the cost

2  of every security purchased in reliance upon a material

3  misstatement or omission." Id.  The securities laws are intended

4  to deter fraud; they are not intended "to provide investors with

5  broad insurance against market losses, but to protect them

6  against those economic losses that misrepresentations actually

7  cause." Id.

8      In this case, Plaintiffs have failed to prove their loss was

9  the proximate result of the alleged misconduct.  It is not enough

10  under Rule 10b-5 to show that the alleged misconduct caused

11  Plaintiffs to enter in to the transaction – it must also have

12  been a cause of their loss.  Plaintiffs put forward no evidence

13  to establish that Defendant and APIM's alleged misstatements and

14  omissions are what caused Plaintiffs to lose their investment.

15  In fact, the only evidence that the Court received proved the

16  contrary.  Defendant testified that the fund's poor performance

17  was due to the 2008 economic slowdown, caused by rising

18  repossession rates, rising default rates, the collateral securing

19  the loans losing its value, and the inability to sell repossessed

20  vehicles.  These assertions were bolstered by the testimony of

21  Mr. Travia.  Further evidence suggested that the Fund's loans to

22  the other funds actually outperformed its sub-prime auto loan

23  business.  Even if Plaintiffs could have established a material

24  misrepresentation and intent, they have failed to show that such

25  misconduct actually caused their loss.  Accordingly, they cannot

26  succeed under Rule 10b-5.

27

28

### iv.  Statute of limitation

Finally, Plaintiffs' Rule 10b-5 claim is barred by the applicable statute of limitation.  In <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u>, the Supreme Court held that the appropriate statute of limitation for the implied private right of action under section 10(b) is the limitation period provided for express causes of action under federal securities laws.  501 U.S. 350 (1991).  Such limitation is found in 28 U.S.C. § 1658, which provides that a claim must be brought not later than the earlier of: 2 years after the discovery of the facts constituting the violation; or 5 years after such violation.  In <u>Merck & Co. v. Reynolds</u>, the Supreme Court held that "discovery" occurs when the plaintiff actually discovers the wrong, or when a reasonably diligent plaintiff would have discovered "the facts constituting the violation," irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.  559 U.S. 633, 634 (2010).

Here, the underlying bankruptcy case was filed on March 27, 2012, and this adversary proceeding was filed on June 20, 2012. The Audit Report disclosed SAC's loans to the other funds, and the loans to SE.  It also listed only one finance company/servicer, SAC, and disclosed that SAC was owned by SE, which was taken over by APIM.  The 2007 portion of the Audit Report indicates that it was available to investors on March 16, 2009.  The 2008 portion of the Audit Report indicates that it was available on August 5, 2009.  Mr. Travia testified that he "didn't think" the Audit Report was available to him until August 2009.  Based upon this information, the Court finds that the

whole Audit Report was available to a reasonably diligent investor as of August 5, 2009.[7]

Under the applicable statute of limitation, Plaintiffs had two years from the time a reasonably diligent plaintiff would have discovered the facts constituting the violation to bring a claim. The Audit Report would have apprised Plaintiffs of all of the facts necessary to determine the untruth of the alleged misstatements and omissions as of August 5, 2009. Accordingly, Plaintiffs were required to bring an action under Rule 10b-5 not later than August 2011; thus, Plaintiffs' claim under 10b-5 is untimely and cannot serve as the basis for their claim under section 523(a)(19).

**d.    Cal. Corp. Code Sections 25401, 25501, and 25504**

Section 25401 of the California Corporations Code provides that it is unlawful for any person, in connection with the offer, sale, or purchase of a security, directly or indirectly to do any of the following:

(a)    Employ a device, scheme, or artifice to defraud;
(b)    Make an untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or
(c)    Engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

Cal. Corp. Code § 25401. Materiality under California's securities statutes mirrors federal law. McCormick v. Fund Am. Cos., 26 F.3d 869, 884 (9th Cir. 1994). Section 25501 provides that any person who violates section 25401 shall be liable to the

_____

[7] The Court notes that Mr. Beattie testified that he became aware of the intra-fund loans at the end of 2007 or early in 2008.

person who purchases a security from him or sells a security to
him, who may then sue either for rescission or for damages (if
the plaintiff or the defendant, as the case may be, no longer
owns the security), unless the defendant proves that the
plaintiff knew the facts concerning the untruth or omission or
that the defendant exercised reasonable care and did not know (or
if he had exercised reasonable care would not have known) of the
untruth or omission. Cal. Corp. Code. § 25501. Thus, negligence
is sufficient to establish liability. See I-Enterprise Co. LLC
v. Draper Fisher Jurvetson Mgmt. Co. V, LLC, 2005 U.S. Dist.
LEXIS 39481, 2005 WL 3590984 (N.D. Cal. Dec. 30, 2005). Section
25504 provides that every person who directly or indirectly
controls a person liable under section 25501 or 25503, every
partner in a firm so liable, every principal executive officer or
director of a corporation so liable, every person occupying a
similar status or performing similar functions, every employee of
a person so liable who materially aids in the act or transaction
constituting the violation, and every broker-dealer or agent who
materially aids in the act or transaction constituting the
violation, are also liable jointly and severally with and to the
same extent as such person, unless the other person who is so
liable had no knowledge of or reasonable grounds to believe in
the existence of the facts by reason of which the liability is
alleged to exist. Cal. Corp. Code. § 25504.

     For the reasons discussed above, the Court finds that
Plaintiffs have failed to meet their burden of establishing a
violation of California's securities laws. The Court has already
concluded that Plaintiffs have failed to establish any material

misrepresentations or omissions.  For those same reasons, the Court further concludes that Plaintiffs have failed to meet their burden of establishing the existence of device, scheme, or artifice to defraud, or that Defendant or APIM engaged in an act, practice, or course of business that operates or would operate as a fraud or deceit.

Plaintiffs similarly have failed to establish that APIM or Defendant acted negligently.  Plaintiffs offered no evidence of negligence at trial, and did not discuss negligence in either of their trial briefs.

Finally, as with its claim under Rule 10b-5, Plaintiffs' state law claims are time-barred.  Section 25506 of the California Corporations Code provides a statute of limitation expiring two years from the discovery of facts constituting a violation.  Cal. Corp. Code. § 25506(b).  As with the statute of limitation for Rule 10b-5, section 25506 begins to run when the plaintiff "discovers the facts constituting the violation or in the exercise of reasonable diligence should have discovered them."  Kramas v. Security Gas & Oil Inc., 672 F.2d 766, 770-71 (9th Cir. 1982).  Accordingly, Plaintiffs had until August 2011 to bring a claim.  Plaintiffs are therefore not entitled to judgment under California's securities laws.

Because Plaintiffs have failed to meet their burden to establish claims under Rule 10b-5 and section 25401, and because such actions are otherwise time-barred, Plaintiffs are not entitled to a judgment which would satisfy the requirements of section 523(a)(19)(B).

## IV.   CONCLUSION

In conclusion, Plaintiffs have failed to meet their burden of establishing nondischargeability under sections 523(a)(4) and 523(a)(19).  Having ruled in favor of the Defendant on both causes of action, the Court will enter judgment in favor of Defendant.

**\*\*END OF MEMORANDUM DECISION\*\***

## Court Service List

[None]